# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN LOMACK, | Civil No.   07cv0017-L (WMc) |
| Petitioner, | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| L. E. SCRIBNER, Warden, | |
| Respondent. | |

This Report and Recommendation is submitted to United States District Judge M. James Lorenz pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Kevin Lomack (hereinafter "Petitioner"), is a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Doc. No. 1.)  Petitioner claims his federal constitutional rights were violated because: (1) an instructional error lessened the prosecution's burden of proof and undermined the testimony of his expert witness; (2) he received ineffective assistance of trial counsel when defense counsel equated the decision to marry to the reasonable doubt standard in closing argument; (3) the trial

court failed to sua sponte correct defense counsel's improper argument; and (4) the trial judge imposed upper term sentences and ordered the sentences to run consecutively based on facts found by the judge by a preponderance of the evidence rather than by a jury beyond a reasonable doubt, in violation of <u>Blakely v. Washington</u>, 542 U.S. 296 (2004).  (Pet. at 5-15.)

Respondent has filed an Answer to the Petition, accompanied by a Memorandum of Points and Authorities in support, and has lodged portions of the state court record.  (Doc. No. 10.)  Respondent contends Petitioner is not entitled to habeas relief on the first three claims because the state court's denial of those claims was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  (Memorandum of Points and Authorities in Support of Answer ["Ans. Mem."] at 7-11.)  Respondent contends the Petition should be stayed with respect to the fourth claim to allow Petitioner to return to state court to seek relief under <u>Cunningham v. California</u>, 549 U.S. __, 127 S.Ct. 856 (2007), or, alternately, that claim four be denied notwithstanding the failure to exhaust state remedies because: (1) relief is precluded by <u>Teague v. Lane</u>, 489 U.S. 288 (1989); (2) the state court's adjudication of the claim was objectively reasonable; and (3) any error was harmless.  (Ans. Mem. at 12-24.)  Following an enlargement of time, Petitioner filed a Traverse.  (Doc. No. 14.)

For the following reasons, the Court finds that although habeas relief is unavailable with respect to claims one through three, resolution of claim four depends on whether <u>Cunningham</u> applies retroactively within the meaning of <u>Teague</u>.  However, because state court remedies remain available with respect to claim four, the Court is unable to either grant or deny habeas relief at this time irrespective of the outcome of the <u>Teague</u> analysis.  The Court therefore recommends this action be stayed pending exhaustion of claim four.

## II.

## STATE PROCEEDINGS

In an Information filed in the San Diego County Superior Court on May 7, 2003, Petitioner was charged with twelve counts of robbery in violation of Cal. Penal Code section 211 arising from eight separate incidents.  (Lodgment No. 1, Clerk's Tr. at 1-5.)  The Information alleged that Petitioner had personally used a firearm during each of the crimes, and had suffered

three prior felony convictions, each of which constituted a "strike" under California's Three Strikes law.  (Id. at 1-6.)  On September 10, 2004, a jury found Petitioner guilty on all twelve counts and found true the allegation that he had personally used a firearm during the commission of all twelve counts.  (Id. at 196-207.)  Petitioner waived his right to a jury trial as to the prior conviction allegations, and in a bifurcated proceeding the trial judge found true beyond a reasonable doubt that Petitioner had suffered three prior serious felony convictions.  (Id. at 194-95.)  Petitioner was sentenced to 335 years-to-life in state prison.  (Id. at 211-13.)

Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One, raising the same claims presented in his federal habeas Petition here.  (Lodgment No. 3.)  His conviction was affirmed in all respects in an unpublished opinion.  (Lodgment No. 5, People v. Lomack, No. D0045450, slip op. (Cal. Ct. App. Sept. 20, 2005.)  Petitioner thereafter filed a petition for review in the California Supreme Court.  (Lodgment No. 6.)  That petition was denied by an order which stated in full: "Petition for review DENIED."  (Lodgment No. 7, People v. Lomack, No. S138145, slip op. (Cal. Dec. 5, 2005).)

## III.

## UNDERLYING FACTS

The following statement of facts is taken from the appellate court opinion affirming Petitioner's conviction on direct review.  This Court gives deference to state court findings of fact and presumes them to be correct.  28 U.S.C. § 2254(e)(1); see also Sumner v. Mata, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to factual findings of both state trial and appellate courts).

1. *Count 1 - Tony Russell and Kimberly Sanders (Burger King)*

On February 15, 2003, at about 8:00 p.m., Lomack entered a Burger King restaurant wearing a green puffy jacket.  Tony Russell and Kimberly Sanders were working at the time.  Lomack tapped a gun on the counter two or three times.  Russell opened the safe and gave Lomack the money.  Lomack then fled with the money out the back door.

Russell described the robber as a "tall and big" Black male.  Sanders described the robber as an African-American male, a little over six feet, "kind of big built" with a heavy, dark complexion.  Russell and Sanders both positively identified Lomack as the robber.

### 2. *Count 2 - Joel Brinton (Carl's Junior)*

On February 17, 2003, at about 9:15 p.m., Lomack entered a Carl's Junior restaurant. He approached Joel Brinton, who was working at the counter, pulled out a handgun and tapped the gun twice on the counter. Brinton opened the cash register and handed Lomack $70 in cash. Lomack then told Brinton to open the safe. Brinton opened a drop box and gave Lomack approximately $800. Lomack placed the money in the pocket of the green blazer he was wearing. Lomack again told Brinton to open the safe. Brinton told Lomack he did not have keys to the safe and placed the keys on the counter for Lomack to see. Lomack then left the restaurant.

Brinton described the robber to the police as a "black man, six/foot three, weighing approximately 300 pounds." At trial, Brinton testified he would "revise" the weight to "about 240" pounds because he "couldn't gather approximately how much he weighed at that time." Brinton identified Lomack as the robber in a photographic lineup and positively identified him in court as well.

### 3. *Counts 3 and 4 - Cristal Serrano and Phillip Valdez (Carl's Junior)*

On February 23, 2003, at about 7:30 p.m., Lomack entered a Carl's Junior restaurant. He approached Cristal Serrano who was working the cash register. Phillip Valdez, the assistant manager, went to the register to see if Serrano needed any assistance. Lomack tapped a gun on the counter and demanded the money from the cash registers. Valdez opened all of the cash registers and handed Lomack about $380.

Valdez described the robber as "a large, tall black male," that was "maybe six/four, 300 pounds." Valdez also identified shoes taken from Lomack as being similar to the shoes the robber was wearing. Photographs taken from surveillance videotape depicted Lomack during the robbery. Both Valdez and Serrano identified Lomack as the robber.

### 4. *Counts 5 and 6 - Evan Corbin and Alfonso Florian (Kragen Auto Parts)*

On February 28, 2003, at about 8:30 p.m., Lomack entered a Kragen Auto Parts store. He approached Evan Corbin, who was working the cash register, displayed a gun, and told Corbin to open the register and give him the money. Corbin called over the manager, Alfonso Florian. Florian saw defendant display a gun he had near his waist. Florian opened the cash register and Corbin placed the cash drawer on the counter. Lomack then grabbed about $300 from the cash drawer. Lomack then asked where the rest of the money was. Florian told him there was no more money because he had "dropped" the rest of the money in a locked safe that could only be opened by an armored guard. Lomack then walked out of the store.

Florian described the robber as "maybe six/two, six/three, medium to heavyset, male, African-American." Florian was shown a photographic lineup and identified appellant as the robber with 80 percent certainty. Florian stated he was only 80 percent certain because the robber had a hat on and the individuals in the lineup did not have hats, thus he could not be sure of the robber's features "from above his brows." In court, both Florian and Corbin identified Lomack as the robber. Still photographs, taken from surveillance video, depicted Corbin, Florian, and Lomack during the robbery.

### 5. *Count 7 - Robert Hammer (Napa Auto Parts)*

On March 1, 2003, at about 3:30 p.m., Lomack entered a Napa Auto Parts store wearing baggy blue jeans, an orange T-shirt, sunglasses, and a yellow construction hat. Lomack tapped a gun on the counter. Lomack told Robert Hammer, an assistant manager of the store, to give him the money. Hammer opened a register and gave Lomack $540.28. Lomack then walked out of the store.

Hammer described the robber as "a large man, about six/four, six/five . . . (a)pproximately about 280 . . . Black." Hammer identified Lomack as the robber from a photographic lineup and in court.

### 6. *Counts 8 and 9 - Sarah Yarbrough and Alejandra Vasquez (Carl's Junior)*

On March 2, 2003, at about 7:30 p.m., Lomack entered a Carl's Junior restaurant wearing a hooded jacket and a baseball cap. He approached Sarah Yarborough, who was working the register, and demanded money. Yarbrough called Alejandra Vasquez, the night manager, to come over. Lomack pulled a gun out and told Vasquez to give him the money. Vasquez opened a drop box and put the $40 inside on the counter. Yarbrough then gave Lomack the money from the drive-thru register after Lomack demanded more money. Lomack left the restaurant after Vasquez told him she did not have keys to the safe.

Lomack was depicted in still photographs taken from a video camera that was operating at the time of the robbery. Both Vasquez and Yarbrough identified Lomack as the robber.

### 7. *Counts 10 and 11 - Justin Carter and Nelson Morales (Napa Auto Parts)*

On March 4, 2003, at about 3:00 p.m., Lomack entered a Napa Auto Parts store. Lomack approached Justin Carter, who was working at the counter. Lomack tapped a gun on the counter and then pointed the gun at Carter and asked for the money from the register and the safe. Carter handed Lomack between $150 and $200 from the register. Lomack then told Nelson Morales, the assistant manager, to give him the rest of the money. Morales took money from another cash register and walked towards Lomack. After Lomack pointed his gun at Morales and demanded the money, Morales gave it to him. Lomack then left the store.

Morales described the robber as "big, Over six feet. Over 250 pounds . . . (h)e was black." Carter described the robber as "six/three, six/four, 240, 250. African-American, brown jacket, pants." Carter also obtained the license plate number of a Toyota Camry in which Lomack drove away in. Both Carter and Morales identified Lomack as the robber in photographic lineups and in court.

### 8. *Count 12 - Nathan Cocco (Big 5 Sporting Goods)*

On March 10, 2004, at about 6:50 p.m., Lomack entered a Big 5 Sporting Goods store wearing a bright orange jersey and an orange baseball hat with blue trim. Lomack approached the register of Nathan Cocco, an assistant manager, and told Cocco he was robbing the store. Lomack took a gun out of his pocket and tapped it on the counter. Cocco gave Lomack about $500 to $600 from the cash registers. Lomack then left through the front door. In court, Cocco identified Lomack as the robber.

B. *Defense Case*

Dr. Robert Shomer, an expert in eyewitness identification, testified that a body of research indicates that eyewitness identification is not as reliable as people tend to believe it is. Dr. Shomer discussed various factors that can make identification more or less accurate. He stated that factors that could increase identification accuracy include good lighting, "(c)lose distance as a part-as compared to long distances," the amount of time looking at the person to be identified, and how similar the eyewitness looks to the perpetrator. He testified that factors that may decrease accuracy include whether a gun was used, the "general intent of the situation" (i.e., hostile, life-threatening, or routine), passage of time, and the procedure used to obtain the identification.

Dr. Shomer also discussed whether the confidence of an eyewitness is a good indication of accuracy and whether the jury should consider the confidence of the witness. He testified, "Confidence is not something that should be considered just in terms of the end product. It certainly needs to be considered. I mean, obviously, if the witness said, 'Well, gee, I don't know,' you would have to consider that. (¶) So, sure, you need to consider confidence. But it should not be considered in just a pure, simple, "the more confident they are, the more accurate they are." That's not the way it should be considered. So I'm not saying anything different than the (CALJIC No 2.92 jury) instruction. I'm simply saying that, yes, it should be considered and, hopefully, I'm providing some information that if it's chosen to be-if anyone chooses to use it, it might be useful to evaluate confidence."

(Lodgment No. 5, <u>People v. Lomack</u>, No. D0045450, slip op. at 3-8.)

## IV.

## **PETITIONER'S CLAIMS**

1. Petitioner was denied his right to due process, to a fair trial and to present witnesses under the Sixth and Fourteenth Amendments when the trial court instructed the jury pursuant to CALJIC 2.92 that the level of confidence a witness has in their identification is a factor the jury should consider in assessing the accuracy of the identification, because the instruction lowered the prosecution's burden of proof, undermined the testimony of Petitioner's expert witness, and "reinforced a common misconception that has been recognized as a contributing factor in the conviction of innocent individuals." (Pet. at 5-6.)

2. Petitioner received ineffective assistance of counsel in violation of the Sixth Amendment because defense counsel misstated the standard for reasonable doubt during closing argument by equating it with the decision to marry. (Pet. at 7-9.)

/ / /

/ / /

-6-

07cv0017

3.   Petitioner was denied his right to a fair trial and to due process in violation of the Sixth and Fourteenth Amendments because the trial judge failed to sua sponte correct defense counsel's misstatement regarding reasonable doubt.  (Pet. at 10-11.)

4.   Petitioner was denied his Sixth Amendment right to a jury trial within the meaning of <u>Blakely</u> when the trial judge imposed an upper term sentence as to all twelve counts and ordered eight of the sentences to run consecutively based on findings made by the judge under a preponderance of the evidence standard rather than beyond a reasonable doubt. (Pet. at 14-15.)

**V.**

**DISCUSSION**

For the following reasons, the Court finds that the state court's adjudication of claims one through three was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts. However, the state court's adjudication of claim four was contrary to and/or involved an unreasonable application of clearly established federal law set forth in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000), <u>Blakely v. Washington</u>, 542 U.S. 296 (2004) and <u>United States v. Booker</u>, 543 U.S. 220 (2005), for the reasons explained in <u>Cunningham</u>.  The Court need not decide at this time whether <u>Cunningham</u> announced a new rule which may not be applied retroactively under <u>Teague</u>, however, because state court remedies remain available to Petitioner with respect to claim four.  This Court is precluded from granting a Petition which contains an unexhausted claim.  <u>See</u> 28 U.S.C. § 2254(b)(1).  The Court may deny a Petition which contains an unexhausted claim on the merits "only when it is perfectly clear that the applicant does not raise even a colorable federal claim."  <u>Cassett v. Stewart</u>, 406 F.3d 614, 623-24 (9th Cir. 2005), <u>cert. denied</u>, 126 S.Ct. 1336 (2006) (holding that this high standard is necessary to give due consideration to the principles of comity and the legislative goals of AEDPA so as to avoid "depriv[ing] state courts of the opportunity to address a colorable federal claim in the first instance and grant relief if they believe it is warranted.")  Respondent's arguments that habeas relief is unavailable as to claim four are insufficient to overcome the <u>Cassett</u> standard, and the Court recommends the Petition be stayed while state court remedies are exhausted.

**A.** **Standard of Review.**

Title 28, United States Code, § 2254(a), sets forth the following scope of review:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States</u>.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

Under 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (1)-(2) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

1  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United

2  States Supreme] Court's decisions." Williams, 529 U.S. at 412.

3      Habeas relief is also available if the state court's adjudication of a claim "resulted in a

4  decision that was based on an unreasonable determination of the facts in light of the evidence

5  presented in state court." 28 U.S.C.A. § 2254(d)(2) (West 2006). In order to satisfy this

6  provision, Petitioner must demonstrate that the factual findings upon which the state court's

7  adjudication of his claims rest, assuming they rest on a factual determination, are objectively

8  unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

9  **B.    Petitioner is not entitled to habeas relief as to claim one.**

10     In claim one, Petitioner contends the trial court erred in instructing the jury pursuant to

11  CALJIC 2.92 that a eyewitness' level of confidence in their identification is a factor the jury

12  should consider in assessing the accuracy of the identification. (Pet. at 5-6.) Petitioner contends

13  the instruction violated his right to due process, to a fair trial and to present witnesses, as

14  protected by the Sixth and Fourteenth Amendments, because it lowered the prosecution's burden

15  of proof, unfairly undermined the testimony of Petitioner's expert witness, and "reinforced a

16  common misconception that has been recognized as a contributing factor in the conviction of

17  innocent individuals." (Id.) Respondent contends the state appellate court's denial of this claim

18  was neither contrary to, nor involved an unreasonable application of, clearly established federal

19  law, and that any error was harmless. (Ans. Mem. at 7-9.)

20     Petitioner presented claim one to the state supreme court in a petition for review of the

21  opinion of the appellate court denying this claim. (Lodgment No. 6.) That petition was denied

22  by an order which stated in full: "Petition for review DENIED." (Lodgment No. 7, People v.

23  Lomack, No. S138145, slip op. at 1.) Claim one was also presented to the state appellate court

24  on direct appeal. (Lodgment No. 3 at 11-23.) The appellate court denied the claim in a reasoned

25  opinion. (Lodgment No. 5, People v. Lomack, No. D0045450, slip op. at 9-15.)

26     In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Court adopted a presumption which

27  gives no effect to unexplained state court orders but "looks through" them to the last reasoned

28  state court decision. The Court will therefore look through the silent denial by the state supreme

court to the appellate court opinion.  The appellate court first rejected the People's argument that Petitioner had waived a challenge to CALJIC No. 2.92.[1]  (Lodgment No. 5, <u>People v. Lomack</u>, No. D0045450, slip op. at 10-11.)  The appellate court next found that the instruction was proper under California law.  (<u>Id.</u> at 11-13.)  The appellate court then stated:

> Here, the jury was instructed that it should "consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion," when it considers expert testimony.  Thus, if the jury was persuaded by Dr. Shomer's testimony, the instructions allowed it to infer that the eyewitness's identifications were not necessarily accurate.  The jury also remained free to reject Dr. Shomer's testimony although it was uncontradicted.  (*Wright, supra*, 45 Cal.3d at pp. 1142-1143.)  Indeed, Dr. Shomer himself noted that he was "not saying anything different that the (CALJIC No. 2.92) instruction.  I'm simply saying that, yes, it should be considered and, hopefully, I'm providing some information that if it's chosen to be-if anyone chooses to use it, it might be useful to evaluate confidence."  Thus, even Dr. Shomer did not believe the jury instruction contradicted or undermined his testimony; rather, he believed the certainty factor should be considered, but the instruction should be viewed under the lens he proposed.  [Footnote omitted]

> * * *

> The certainty of the witness is only one of 12 listed factors that the jury should consider when determining the weight to be given to eyewitness identification. Moreover, the instruction is written in a neutral manner, instructing the jury to consider "(t)he extent to which the witness is either *certain or uncertain* of the identification."  (CALJIC No. 2.92, italics added.)  Therefore, considering the certainty of the witness may help the defendant's case if the jury decides to not give an eyewitness as much credit because he or she is not certain of the identification.  Indeed, Dr. Shomer testified that, "if the witness said, 'well, gee, I don't know,' you would have to consider that."  The uncertainty of the witness could undermine the credibility of the witness's identification and thus, benefit the defendant.  Lomack's contention that the certainty instruction lessened

---

[1] CALJIC No. 2.92, as given, stated: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged.  In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness, as well as other factors which should bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following: [¶] The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act; [¶] The stress, if any, to which the witness was subjected at the time of the observation; [¶] The witness' ability, following the observation, to provide a description of the perpetrator of the act; [¶] The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness; [¶] The cross-racial or ethnic nature of the identification; [¶] The witness' capacity to make an identification; [¶] Whether the witness was able to identify the alleged perpetrator in a photographic lineup; [¶] The period of time between the alleged criminal act and the witness' identification; [¶] Whether the witness had prior contacts with the alleged perpetrator; [¶] **The extent to which the witness is either certain or uncertain of the identification**; [¶] Whether the witness' identification is, in fact, the product of his or her recollection; and [¶] Any other evidence relating to the witness' ability to make an identification." (Lodgment No. 2, Reporter's Tr. at 523-24.) (emphasis added).

1    the prosecution's burden is unavailing, and the court did not err by including the

2    certainty factor when instructing the jury pursuant to CALJIC No. 2.92.

3    (Lodgment No. 5, <u>People v. Lomack</u>, No. D0045450, slip op. at 14-15.)

4         Clearly established federal law provides that federal habeas relief is not available for an

5    alleged error in the interpretation or application of state law.  <u>Estelle v. McGuire</u>, 502 U.S. 62,

6    67-68 (1991).  Rather, in order to merit federal habeas relief regarding the alleged instructional

7    error, Petitioner must show the instructional error "so infected the entire trial that the resulting

8    conviction violates due process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977) (quoting <u>Cupp</u>

9    <u>v. Naughten</u>, 414 U.S. 141, 147 (1973)).  However, even if the trial court's instructional error

10   violated due process, habeas relief would still not be available unless the error had a "substantial

11   and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507

12   U.S. 619, 637 (1993); <u>California v. Roy</u>, 519 U.S. 2, 5 (1996).

13        A jury instruction that relieves the prosecution of its burden of proving every element of

14   an offense beyond a reasonable doubt violates due process.  <u>Kibbe</u>, 431 U.S. at 153.  Although

15   a defective reasonable doubt instruction by itself may constitute structural error, a jury

16   instruction which is ambiguous will violate due process only when a reasonable likelihood exists

17   that the jury has applied the challenged instruction in a manner which violates the federal

18   Constitution.  <u>Estelle</u>, 502 U.S. at 72; <u>see also</u> <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993)

19   (recognizing that although a defective reasonable doubt instruction itself may be structural error,

20   with respect to other instructional errors, "[a] reviewing court may be able to conclude that the

21   [instruction] played no significant role in the finding of guilt beyond a reasonable doubt.")

22        With respect to Petitioner's contention that the instruction "unfairly undermined the

23   testimony of [his] expert witness," and "reinforced a common misconception that has been

24   recognized as a contributing factor in the conviction of innocent individuals" (Pet. at 5-6), he has

25   not demonstrated that any federal constitutional right has been violated for these reasons because

26   he has failed to show there is a reasonable likelihood the jury applied the instruction in a manner

27   which violates the federal Constitution.  <u>Estelle</u>, 502 U.S. at 72.  In support of these contentions

28   here (Traverse at 3) and in the state court, Petitioner relied on Justice Mosk's dissent in <u>People</u>

v. Wright, 45 Cal.3d 1126 (1988), which observed that there is a "lack of correlation between the degree of confidence an eyewitness expresses in his identification and the accuracy of the identification," and that some studies even suggested a negative correlation.  Wright, 45 Cal.3d at 1159 (dissenting opinion of Mosk, J.)  The instruction did not unfairly undermine Petitioner's expert witness because, as the state court here correctly found, Petitioner's expert agreed that the certainty of a witness' identification is a factor to be considered.  His expert testified that studies have found no relation at all between the degree of confidence a person has and the accuracy of their identification.  (Lodgment No. 2, Reporter's Tr. at 320-21.)  When asked about the factor listed in CALJIC No. 2.92 at issue here, the expert stated:

> I'm saying that if that jury instruction says "Please consider this," I think it does need to be considered.  But it doesn't say in what way do you consider it.  I'm saying it needs to be considered as the end product of a long process.  And if someone was uncertain at an earlier time – let's say at a live lineup or 6-pack, and you were making a choice of somebody who was most like or resembles or similar to, and then they come into court later and they say, "That's the guy; I'm absolutely sure," both things have to be considered with respect to confidence. [¶] Confidence is not something that should be considered just in terms of the end product.  It certainly needs to be considered.  I mean, obviously, if the witness said, "Well, gee, I don't know," you would have to consider that.  [¶] So, sure, you need to consider confidence.  But it should not be considered in just a pure, simple "the more confident they are, the more accurate they are."  That's not the way it should be considered.  So I'm not saying anything different than the instruction.  I'm simply saying that, yes, it should be considered and, hopefully, I'm providing some information that if it's chosen to be – if anyone chooses to use it, it might be useful to evaluate confidence.

(Id. at 321-22.)

Thus, the instruction did not undermine the testimony of Petitioner's expert that, in his opinion, there is no direct relationship between certainty and accuracy in eyewitness identifications.  The factor listed in CALJIC 2.92 at issue here, "the extent to which the witness is either certain or uncertain of the identification," was one of eleven enumerated factors which the jury "was not limited to" in determining the accuracy of the identification.  The expert explained his opinion regarding application of that factor, and the state court did not err in finding that his opinion was not undermined by the instruction.  As to Petitioner's claim that the instruction "reinforced a common misconception that has been recognized as a contributing factor in the conviction of innocent individuals," for the reasons discussed immediately below,

1  he has not shown a reasonable likelihood the jury applied the instruction in a manner which

2  violates the federal Constitution.  Estelle, 502 U.S. at 72.

3       Assuming Petitioner could demonstrate an instructional error in this regard, and further

4  assuming he could demonstrate the state court's adjudication of his claim was objectively

5  unreasonable, he must still show the error had a "substantial and injurious effect or influence in

6  determining the jury's verdict." Brecht, 507 U.S. at 637; Sullivan, 508 U.S. at 281.  Petitioner

7  has failed to show the instruction had any effect or influence whatsoever on the jury for several

8  reasons.  The certainty of the witnesses was only one of many factors the jury was instructed

9  they were permitted to consider in determining the weight given to the identifications.

10  Petitioner's expert testified that the certainty of an identification should be considered in the

11  context of the entire identification process, including whether an earlier identification was

12  tentative.  Of the thirteen victims who testified at trial and identified Petitioner in court as the

13  robber, each one had a face-to-face confrontation with Petitioner, who performed the same

14  characteristic tapping of the gun on the counter during all but two of the robberies, and the jury

15  heard testimony regarding the identifications made prior to trial.  Petitioner's expert explained

16  that the prior identifications, including the conditions under which they were made, have an

17  effect on the certainty of a later identification.   The jury was also shown surveillance

18  photographs of Petitioner taken during three of the robberies, and did not need to rely entirely

19  on the eyewitness identifications.  There is nothing whatsoever in the record to suggest that

20  instructing the jury that the certainty of the witness' identifications was one of many factors the

21  jury was permitted to consider in determining what weight was to be given the eyewitness'

22  identifications, influenced the jury's decision in any way, much less had a "substantial and

23  injurious effect or influence" on the verdict.  Brecht, 507 U.S. at 637.

24       The adjudication of claim one by the state court was neither contrary to, nor involved an

25  unreasonable application of, clearly established federal law, and was not based on an

26  unreasonable determination of the facts. Moreover, any possible error arising from the

27  instruction was harmless.  The Court therefore recommends that habeas relief be denied as to

28  claim one.

**C.    Petitioner is not entitled to habeas relief as to claim two.**

Petitioner contends in claim two that he received ineffective assistance of counsel in violation of the Sixth Amendment because trial counsel equated the decision to marry with the standard for reasonable doubt during closing argument, thereby misstating the standard for reasonable doubt. (Pet. at 7-9.)  Respondent contends that the state appellate court's application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) to this claim, finding that although defense counsel's argument was improper Petitioner suffered no prejudice, was objectively reasonable. (Ans. Mem. at 10-11.)

The Court will look through the silent denial of claim two by the state supreme court to the appellate court opinion.  <u>Ylst</u>, 501 U.S. at 804.  After summarizing the applicable law, which included the <u>Strickland</u> standard, the appellate court stated:

> During closing argument, defense counsel analogized the beyond a reasonable doubt standard to the decision to marry, stating that when you get married "(y)ou've got to be certain enough in your mind, as certain as anybody can be, that your marriage is going to last forever."  He then went on to tell the jury, "(y)ou say, 'I'm going to marry this person because I believe . . . I believe beyond a reasonable doubt, . . . believe it's going to last forever.'"  Counsel also compared an "abiding conviction" to the decision to get married stating, "This abiding conviction, it's the same degree of conviction that you need to have when you decide if you're going to get married.  Now, I don't mean to imply to you that anything to do with the emotional aspects of marriage have anything to do with your verdict here.  No.  It's the degree of certainty I'm talking about."

> Lomack relies on the California Supreme Court's decision *People v. Brannon* (1873) 47 Cal. 96 (*Brannon*) and this court's decision in *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*) to support his contention that analogizing the beyond a reasonable doubt standard to the decision to marry incorrectly states the prosecution's burden of proof.  We recognize the *Brannon* and *Nguyen* decisions and agree that it is not proper to compare the beyond a reasonable doubt standard to the decision to marry.

> In *Brannon*, the California Supreme Court stated: "The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence.  Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only.  But in the decision of a criminal case involving life or liberty, something further is required.  There must be more than a preponderance of evidence.  There must be in the minds of the jury an abiding conviction, to a moral certainty, of the truth of the charge, derived from a comparison and consideration of the evidence." (*Brannon, supra,* 47 Cal. at p. 97.)  After quoting *Brannon*, we stated in *Nguyen* that "(w)e strongly disapproved of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry.  The argument is improper even when the prosecutor, as here, also states that the standard for reasonable doubt is 'very high' and tells the jury to read the instructions." (*Nguyen, supra,* 40

Cal.App.4th at p. 36.)  It is evident that daily life decisions, such as the decision to marry, are not apt analogies to compare with the beyond a reasonable doubt standard.  Therefore, the use of such an analogy is error.  [Footnote: We note that defense counsel did emphasize the importance of the decision-a decision that will "last forever."  He also stated that the verdict is different from marriage because "you cannot get a divorce from your verdict."  However, the comparison still lacks the amount of conviction that the beyond a reasonable doubt standard requires. Further, the analogy may confuse jurors who view marriage as an everyday decision, which only requires the preponderance of evidence to make, thus lessening the burden of the prosecution.]

### C.  Prejudice

Although defense counsel erred by comparing the beyond a reasonable doubt standard to the decision to marry, the error was not prejudicial.  Because no prejudice is shown, we also need not consider whether the court erred in failing to correct defense counsel's error.

Our consideration of the entire record in this case leads us to conclude that it is not reasonably probable that had defense counsel not compared the beyond a reasonable doubt standard to the decision to marry, the jury would have reached a verdict more favorable to Lomack.  We base this holding on (1) the overall strength of the evidence; (2) the description of the beyond a reasonable doubt standard by the court and in the jury instructions; and (3) the absence of any indication that the jury was uncertain or confused.

#### 1.  *Overall strength of the evidence*

The evidence as a whole is sufficiently convincing to warrant sustaining the guilty verdict.  Eyewitnesses identified Lomack as the robber in each of the 12 robberies.  Further, the eyewitnesses gave consistent descriptions of the robber as a heavy-set, Black male, over six feet tall.  Also, video surveillance showed Lomack as the robber at three of the robberies.  Moreover, Lomack exhibited a pattern of tapping a gun on the counter during the robberies.  The evidence is overwhelmingly in favor of supporting the convictions.

#### 2.  *Description of the beyond a reasonable doubt standard*

While comparing the beyond a reasonable doubt standard to the decision to marry was an erroneous analogy, the jury was given the correct definition of the beyond a reasonable doubt standard in a jury instruction that alleviated any potential or possible prejudice.  [Footnote:  The jury was instructed pursuant to CALJIC No. 2.90, which defines reasonable doubt as follows:  "It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."]  The jury was also instructed by the court that "(i)f there is a discrepancy with the law as argued by counsel and the law that I have just given you, you will be guided by my instructions on the law."  Further, defense counsel also paraphrased CALJIC No. 2.90 before he made the erroneous comparison to the decision to marry.

### 3. *No indication of jury confusion*

The record does not indicate the jury was confused by the beyond a reasonable doubt standard or by any of the testimony given. The jury reached a unanimous verdict on all 12 counts and did not indicate it had any problems reaching this conclusion. [Footnote: The jury did ask (1) if they could see exhibit 1, the hand gun and (2) how the jury was to consider evidence across similar crimes, i.e., count 1 versus count 8. These questions had no bearing on the beyond a reasonable doubt standard and thus do not affect our conclusion.]

Therefore, in light of the totality of the evidence, we conclude that the erroneous comparison of the beyond a reasonable doubt standard to the decision to marry was harmless error and a reversal is not required.

(Lodgment No. 5, People v. Lomack, No. D0045450, slip op. at 17-20.)

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined by the Supreme Court of the United States"). For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, he must show counsel's deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable." Id. To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Williams, 529 U.S. at 406; Strickland, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel can not be shown by a preponderance of the evidence to have determined the outcome."). The prejudice inquiry is to be considered in light of the strength of the prosecution's case. Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311 F.3d 928 (9th Cir. 2002).

The appellate court's application of Strickland was objectively reasonable because Petitioner suffered no prejudice for the reasons stated by the appellate court. The jury was correctly instructed on the standard for reasonable doubt. (See Lodgment No. 2, Reporter's Tr.

at 522-23 (CALJIC No. 2.90 as given) and <u>Lisenbee v. Henry</u>, 166 F.3d 997, 999-1000 (9th Cir. 1999) (holding that CALJIC No. 2.90 is constitutional).)  The jury was also instructed that:  "If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." (Lodgment No. 2, Reporter's Tr. at 515.)  Thus, in order for Petitioner to show prejudice, he would have to show that the jury disregarded its instructions.  "The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them." <u>Francis v. Franklin</u>, 471 U.S. 307, 324 n.9 (1985).  The jury was instructed to follow the law as given by the judge and to resolve any conflict between counsel's statement of the law and the law as given in the instructions in favor of the instructions.  There is nothing in the record to indicate the jury did not follow their instructions and apply the correct reasonable doubt standard.  Due to the overwhelming evidence against Petitioner, this is simply not a case, "in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." <u>Bruton v. United States</u>, 391 U.S. 123, 135 (1968) (finding such a situation where jury was instructed to ignore powerfully incriminating extrajudicial statements of a co-defendant which were devastating to the defense, and where the inherently unreliable nature of that evidence was intolerably compounded by the failure of the co-defendant to be subject to cross-examination); <u>see also</u> <u>Luna</u>, 306 F.3d at 966 (noting that the prejudice inquiry is to be considered in light of the strength of the prosecution's case).

The state court's determination that Petitioner was not prejudiced by defense counsel's improper argument is objectively reasonable, and Petitioner has failed to demonstrate that the jury applied an incorrect definition of reasonable doubt.  <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 10 (2002) (stating that where, "it is at least reasonable to conclude that [the state court's conclusion was reasonable] . . . the state court's determination to that effect must stand."); <u>Andrade</u>, 538 U.S. at 75-76. Accordingly, the Court finds that the state appellate court's adjudication of claim two was neither contrary to, nor involved an unreasonable application of, clearly established

1  federal law, and was not based on an unreasonable determination of the facts.  The Court

2  therefore recommends habeas relief be denied as to claim two.

3  **D.      Petitioner is not entitled to habeas relief as to claim three.**

4       In claim three, Petitioner contends he was denied his right to a fair trial and to due process

5  in violation of the Sixth and Fourteenth Amendments because the trial judge failed to sua sponte

6  correct defense counsel's misstatement regarding reasonable doubt. (Pet. at 10-11.) Respondent

7  contends that Petitioner has not overcome the presumption that jurors follow their instructions,

8  which were adequate to dispel any possible confusion caused by defense counsel's improper

9  argument, and the appellate court's rejection of the claim on that basis was objectively

10  reasonable.  (Ans. Mem. at 11.)  Respondent also contends that Petitioner is in any case unable

11  to demonstrate prejudice under Brecht.  (Id.)

12       The appellate court, although finding that it was error for defense counsel to draw the

13  analogy between the decision to marry and reasonable doubt, denied this claim, stating simply:

14  "Because no prejudice is shown, we also need not consider whether the court erred in failing to

15  correct defense counsel's error."  (Lodgment No. 5, People v. Lomack, No. D0045450, slip op.

16  at 19.)

17       Clearly established federal law provides that "before a [non-structural] federal

18  constitutional error may be held harmless, the [state] court must be able to declare a belief that

19  it was harmless beyond a reasonable doubt."  Chapman v. California, 386 U.S. 18, 24 (1967).

20  If the state court applies Chapman, or its state law equivalent, and finds the error harmless

21  beyond a reasonable doubt, habeas relief is available only if the petitioner can demonstrate that

22  the application of Chapman was objectively unreasonable within the meaning of 28 U.S.C.

23  § 2254(d), and that the error "had a substantial and injurious effect or influence in determining

24  the jury's verdict."  Calderon v. Coleman, 525 U.S. 141, 145 (1998), quoting Brecht v.

25  Abrahamson, 507 U.S. 619, 637 (1993); see also Penry v. Johnson, 532 U.S. 782, 795 (2001);

26  Inthavong v. LaMarque, 420 F.3d 1055, 1059 (9th Cir. 2005), cert. denied, 126 S.Ct. 1660

27  (2006).  The Court in Calderon specifically noted that the application of Brecht's "substantial

28  and injurious effect" standard "protects the State's sovereign interest in punishing offenders and

its good-faith attempts to honor constitutional rights . . . while insuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged." Calderon, 525 U.S. at 145 (internal citations and quotation marks omitted).  "Under this standard, an error is harmless unless the "record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" Padilla v. Terhune, 309 F.3d 614, 621-22 (9th Cir. 2002) (quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995)).

Here, the state appellate court did not apply Chapman's harmless error standard because it determined that no error had occurred.  The appellate court found, correctly as discussed above, that no Sixth Amendment violation occurred as a result of defense counsel's analogy because Petitioner was not prejudiced within the meaning of Strickland.  See Strickland, 466 U.S. at 687 (holding that a Sixth Amendment violation requires a showing of deficient performance and prejudice).  Because no federal Constitutional violation occurred, the state court was not required to apply Chapman.

Even assuming the error rose to the level requiring application of the Chapman standard, Petitioner is not entitled to habeas relief unless he can demonstrate that the error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Inthavong, 420 F.3d at 1059.  Petitioner has failed to satisfy that standard for the reasons discussed in claim two regarding his inability to establish prejudice from counsel's argument. Accordingly, the Court recommends habeas relief be denied as to claim three.

**E.    The Court at this time is unable to grant or deny habeas relief as to claim four.**

Petitioner contends in claim four that he was denied his Sixth Amendment right to a jury trial within the meaning of Blakely when the trial judge imposed upper term sentences as to all twelve counts, and ordered eight of the twelve sentences to run consecutively, based on findings made by the judge under a preponderance of the evidence standard rather than by the jury beyond a reasonable doubt. (Pet. at 14-15.)  Respondent contends that the recent Supreme Court opinion in Cunningham, "casts Petitioner's claim in a significantly different light," and Petitioner should be permitted to return to state court to present the claim again in light of

-19-

Cunningham while the Petition is stayed in this Court. (Ans. Mem. at 12.) Respondent alternately contends that although claim four is unexhausted, the Court should deny it as being without merit pursuant to 28 U.S.C. § 2254(b)(2) on the basis that: (1) habeas relief is barred by Teague v. Lane, 489 U.S. 288 (1989); (2) the rejection of the claim by the state court was objectively reasonable; and (3) because any error was harmless. (Ans. Mem. at 12.)

After finding true beyond a reasonable doubt that Petitioner had suffered three prior felony convictions, the trial judge refused to strike any of the prior convictions, and determined that Petitioner would therefore be sentenced under California's Three Strike's law. (Lodgment No. 2, Reporter's Tr. at 602.) Pursuant to the provisions of that law, the trial judge was required to first select from the lower (two years), middle (three years) or upper (five years) term for robbery under California law.[2]

The judge made the following statement at sentencing:

> In utilizing that section, the Court must also determine whether to use the low, middle or upper term, and in this particular case, the Court finds that there were no circumstances in mitigation. The Court finds that circumstances in aggravation, which even considering the *Blakely* case – although I do not believe it is applicable – would include Rule 4.421(1), the crimes in this – excuse me. Rule 4.421(a)(1): The crime in each of these matters involved great threat of great bodily harm or other acts, disclosing a high degree of viciousness or callousness.

> Additionally, each of these counts could be enhanced individually under Rule 4.421(a)(7), and this would be defendant was convicted of other crimes from which consecutive sentences could have been imposed but for which concurrent sentences are being imposed. As I said, I am imposing concurrent sentences on Counts 4, 6, 9 and 11.

> Additionally, the Court finds, as a circumstances in aggravation as to each count, Rule 4.421(b)(1): Defendant has engaged in violent conduct which indicates a serious danger to society.

> Rule 4.421(b)(2): Defendant's prior convictions as an adult are numerous or of increasing seriousness.

> And Rule 4.421(b)(3): Defendant has served a prior prison term.

---

[2] The California sentencing scheme identifies three terms of imprisonment for most offenses, lower, middle and upper, and the sentencing judge's discretion in choosing which term to impose is circumscribed by Cal. Penal Code § 1170(b), which states that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." The California Rules of Court provide that: "Selection of the upper term is justified only if, after a consideration of all the relevant facts, the circumstances in aggravation outweigh the circumstances in mitigation." Cal. Rules of Court, Rule 4.420(b). California law provides that those findings need only be made by the trial judge under a preponderance of the evidence standard. Cunningham, 127 S.Ct. at 862.

07cv0017

1       These last three factors under Rule 4.421(b) are as a result of the true
2   findings in this matter, and the Court's finding that defendant had, in fact suffered
    those crimes as well as the prior convictions.

3       For that reason, then, the Court finds that if the Court takes the upper term
4   of 5 years and adds – the upper term for each count of robbery is 5 years.  I have
    based that and taken that term as the aggravated term based upon the factors in
    aggravation.  The Court is also adding an additional 10 years for the 12022.53(b)
5   allegation.  I am adding 15 years for the three separate serious felony priors
    proved under Penal Code section 667(a), for a total of 30 years – life, a minimum
6   of 30 years, and that is the calculation followed by the Court.

7   (Lodgment No. 2, Reporter's Tr. at 603-04.)

8       The judge then sentenced Petitioner to a separate 30 years-to-life sentence on each of the

9   twelve counts, and added a 10-year enhancement as to each count for use of a firearm, but

10  ordered four of the twelve sentences to run concurrently, for a total of 320 years-to-life.  (Id. at

11  604-05.)  The judge then added three five-year enhancements, one for each of the prior felony

12  convictions, for a total sentence of 335 years-to-life.  (Id. at 605-06.)

13      In Apprendi, the Court held that the Fourteenth Amendment right to due process and the

14  Sixth Amendment right to trial by jury incorporated therein, requires that "[o]ther than the fact

15  of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

16  statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

17  Apprendi, 530 U.S. at 476-77, 490.  In Blakely the Court defined the term "statutory maximum"

18  as used in Apprendi to mean "the maximum sentence a judge may impose solely on the basis of

19  the facts reflected in the jury verdict or admitted by the defendant."  Blakely, 542 U.S. at 303.

20  Finally, in Booker, the Court found that there "is no relevant distinction between the sentence

21  imposed pursuant to the Washington statutes in Blakely and the sentences imposed pursuant to

22  the Federal Sentencing Guidelines" in that case.  Booker, 543 U.S. at 235.  The Booker Court

23  decided, however, that if the factors used by a trial judge to impose a sentence in the upper range

24  are not mandatory, but merely advisory, "their use would not implicate the Sixth Amendment

25  [because judges may] exercise broad discretion in imposing a sentence within a statutory range."

26  Id. at 233.  The California Supreme Court in People v. Black attempted to salvage California's

27  sentencing scheme by finding that the "statutory maximum" for Apprendi purposes was the

28  entire range of terms, from lower through upper, and that because the factors used to impose

upper terms were subject to a reasonableness requirement, they were the functional equivalent of the advisory provisions of the federal guidelines.  People v. Black, 35 Cal.4th 1238, 1255-56 (2005), vacated by Black v. California, 127 S.Ct. 1210 (2007).  That was the state of the law at the time Petitioner sought relief in the state appellate and supreme courts, and at the time his conviction became final.

Petitioner contended on appeal that the trial court erred in finding that Blakely did not apply, and argued that the selection of the upper terms and imposition of consecutive sentences violated his Sixth Amendment right to have a jury determine beyond a reasonable doubt any fact used to increase his sentence.  (Lodgment No. 3 at 29-34.)  The appellate court rejected the claim on the basis that the California Supreme Court had determined in Black that California's sentencing scheme did not violate the Sixth Amendment, and because the Sixth Amendment is not implicated when a sentence is increased based on prior convictions.  (Lodgment No. 5, People v. Lomack, No. D0045450, slip op. at 21-28.)  The United States Supreme Court subsequently abrogated Black and held that California's sentencing scheme violates the Sixth Amendment to the extent it permits a judge to impose upper terms based on facts not found by a jury beyond a reasonable doubt or admitted to by a defendant.  Cunningham, 127 S.Ct. at 868. The Supreme Court vacated Black and remanded for reconsideration in light of Cunningham. Black v. California, 127 S.Ct. 1210 (2007).  However, the Court in Cunningham did not have the occasion to address consecutive sentencing under California law, nor revisit the holding of Apprendi that the mere fact of a defendant's prior convictions is irrelevant to the inquiry whether the Sixth Amendment was violated.  Apprendi, 530 U.S. at 490; United States v. Pacheco-Zepeda, 234 F.3d 411, 415-16 (9th Cir. 2000).

The Court in Cunningham held that:

> Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, . . . [California's sentencing law] violates *Apprendi's* bright-line rule: Except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

Cunningham, 127 S.Ct. at 868, quoting Apprendi, 530 U.S. at 490.

As both the trial and appellate court here observed, California law provides that the existence of prior convictions is an aggravating factor which can support the imposition of an upper term.  Had the trial judge here imposed the upper term based solely on the fact that Petitioner had suffered the prior convictions, all of which the trial judge found to be true beyond a reasonable doubt after Petitioner waived his state right to a jury trial as to the prior conviction allegations, the Sixth Amendment would not be implicated due to the <u>Apprendi</u> exception.[3]

However, the trial judge also relied on several other factors in imposing the upper term, including: (1) the fact that the instant crimes involved a great threat of bodily harm which disclosed a high degree of viciousness; (2) that consecutive sentences could have been imposed for the four terms which were ordered to run concurrently; (3) that Petitioner engaged in violent conduct which indicates that he is a danger to society; and (4) that he had served a prior prison term.  (Lodgment No. 5, <u>People v. Lomack</u>, No. D0045450, slip op. at 24-25.)  The first two of the factors just listed, and perhaps the third, are based on findings by the trial judge unconnected to Petitioner's prior convictions.  The Supreme Court has now held that California sentencing law violates the Sixth Amendment because it provides that the findings necessary to impose an upper term, other than the fact of a prior conviction, need only be made by a judge under a preponderance of the evidence standard.  <u>Cunningham</u>, 127 S.Ct. at 862.

The appellate court also found no Sixth Amendment violation because, in addition to the now erroneous reasoning of <u>Black</u> that <u>Blakely</u> did not apply to California's sentencing scheme, reliance on the prior convictions was sufficient in and of itself to support the selection of the upper term.  (Lodgment No. 5, <u>People v. Lomack</u>, No. D0045450, slip op. at 27.)  To the extent a federal Constitutional violation occurred when the trial judge used factors other than the fact of Petitioner's prior convictions to impose the upper terms, the state court's finding that no error occurred (or that any error was harmless) because the fact of Petitioner's prior convictions standing alone was sufficient to impose the upper terms, is contrary to clearly established federal

---

[3] Although this aspect of the holding of <u>Apprendi</u> may eventually be revisited (<u>see</u> <u>Rangel-Reyes v. United States</u>, 547 U.S. __, 126 S.Ct. 2873 (2006) (Opinion of Thomas, J., dissenting from denial of certiorari) (recognizing that a majority of the Justices now reject the exception announced in <u>Apprendi</u>)), it continues to be binding precedent on this Court.

law as set forth in <u>Chapman</u>.  Clearly established federal law provides that "before a [non-structural] federal constitutional error may be held harmless, the [state] court must be able to declare a belief that it was harmless beyond a reasonable doubt." <u>Chapman</u>, 386 U.S. at 24.  If the state court applies <u>Chapman</u>, or its state law equivalent, and finds the error harmless beyond a reasonable doubt, federal habeas relief is available only if the petitioner can demonstrate that the application of <u>Chapman</u> was objectively unreasonable within the meaning of 28 U.S.C. § 2254(d), <u>and</u> that the error "had a substantial and injurious effect or influence in determining the jury's verdict." <u>Calderon v. Coleman</u>, 525 U.S. 141, 145 (1998), quoting <u>Brecht</u>, 507 U.S. at 637; <u>see also</u> <u>Penry</u>, 532 U.S. at 795; <u>Inthavong</u>, 420 F.3d at 1059.  "Under this standard, an error is harmless unless the "record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" <u>Padilla v. Terhune</u>, 309 F.3d 614, 621-22 (9th Cir. 2002) (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1995)).

Here, the state appellate court did not apply <u>Chapman</u>'s harmless beyond a reasonable doubt standard, or a state law equivalent, when it determined that reliance on the factors unrelated to Petitioner's prior convictions was harmless.  Rather, the appellate court simply stated that the reliance on an acceptable factor renders reliance on any remaining unacceptable factors irrelevant.  The application of that harmless error standard was, (assuming a sentencing error occurred which gave rise to a federal Constitutional violation), contrary to <u>Chapman</u> because there was no attempt to determine if the error in relying on the other factors was harmless beyond a reasonable doubt.  (<u>See</u> <u>Bains v. Cambra</u>, 204 F.3d 964, 982 (9th Cir. 2000) (failure of state court to apply <u>Chapman</u> on direct review when required is contrary to clearly established federal law)).  As set forth below, at the time Petitioner's conviction became final, clearly established federal law required application of the <u>Chapman</u> harmless error analysis to the type of sentencing error which occurred here.

Thus, there are two aspects of claim four.  First, the Court must determine whether a federal Constitutional violation occurred when the trial judge selected the upper terms and/or

ordered the sentences to run consecutively. This requires addressing Respondent's argument that clearly established federal law was not violated because there is no prohibition against consecutive sentencing, and even <u>Cunningham</u> does not prevent imposition of upper term sentences when they are imposed on the basis of prior convictions, but that even if the rule of <u>Cunningham</u> was violated, <u>Teague</u> precludes application of such a new rule. The second step requires the Court to determine whether, assuming a sentencing error occurred which rose to the level of a federal Constitutional violation, the "record review leaves the conscientious judge in grave doubt about the likely effect of [the] error." <u>Padilla</u>, 309 F.3d at 621-22: <u>United States v. Lyons</u>, 454 F.3d 968, 972 (9th Cir. 2006) (holding that <u>Booker</u> error is subject to harmless error review). The error here being the imposition of the upper terms based not only on the fact of Petitioner's prior convictions, but on the additional findings by the trial judge that the crimes involved a great threat of bodily injury which showed a high degree of viciousness, and that Petitioner engaged in violent conduct which indicates he is a danger to society, because those factors were found by the trial judge under a preponderance of the evidence standard.[4]

### 1) State court remedies remain available as to claim four.

Respondent first contends claim four is unexhausted due to the intervening <u>Cunningham</u> decision and therefore Petitioner has state court remedies available to him, and suggests this action be stayed while Petitioner returns to state court. (Ans. Mem. at 14-15.) Petitioner contends that claim four is exhausted because it has been presented to the state supreme court, and <u>Cunningham</u> did not cast it in a different light. (Traverse at 8-9.)

---

[4] The other aspect of claim four, that the trial court erred in imposing consecutive sentences, was denied by the appellate court on the basis that <u>Apprendi</u> does not apply to the decision to run an otherwise constitutional sentence consecutively. (Lodgment No. 5, <u>People v. Lomack</u>, No. D0045450, slip op. at 27-28.) Respondent has not addressed this aspect of claim four in the Answer. However, the Ninth Circuit as determined that <u>Apprendi</u> is not implicated by the decision to run sentences consecutively in the context of the federal guidelines when the sentences did not violate <u>Apprendi</u> in their own right. <u>United States v. Buckland</u>, 289 F.3d 558, 570-72 (9th Cir. 2002). Moreover, unlike the defendant in <u>Cunningham</u> who had a right under California law to imposition of a middle-term sentence absent findings of aggravating factors, Petitioner has not shown a corresponding right to concurrent sentencing under California law similar to his right to a middle term sentence. <u>See</u> <u>Blakely</u>, 542 U.S. at 309 (recognizing that the legal right to a lesser sentence is the main concern in providing Sixth Amendment protection to sentencing decisions). Because the consecutive sentencing aspect of claim four presents a weaker argument that claim four is colorable than the upper term aspect of the claim, the Court does not address it in this Report, although it will ultimately need to be addressed along with the remainder of claim four once state remedies have been exhausted.

AEDPA provides that: "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C.A. § 2254(c) (West 2006).  In response to the <u>Cunningham</u> decision, the California Supreme Court recently ordered briefing in <u>People v. Towne</u> regarding the effect of <u>Cunningham</u>, where the Court stated:

> The parties are directed to serve and file simultaneous supplemental briefs addressing the effect of Cunningham v. California (Jan. 22, 2007, No. 05-6551) 549 U.S. ___, 2007 WL 135687, on any of the issues presented in this case.  The court specifically requests that the supplemental briefs address the following issues:  (1) Do Cunningham v. California, supra, and Almendarez-Torres v. United States (1998) 523 U.S. 224, 239-247, permit the trial judge to sentence defendant to the upper term based on any or all of the following aggravating factors, without submitting them to a jury:  the defendant's prior convictions as an adult are numerous and of increasing seriousness; the defendant has served a prior prison term; the defendant was on parole when the crime was committed; the defendant's prior performance on probation or parole was unsatisfactory (California Rules of Court, Rule 4.421, subds. (b)(2)-(b)(5))?  (2) is there any violation of the defendant's Sixth Amendment rights under Cunningham v. California, supra, if the defendant is eligible for the upper term based upon a single aggravating factor that has been established by means that satisfy the governing Sixth Amendment authorities - by, for example, a jury finding, the defendant's criminal history, or the defendant's admission - even if the trial judge relies on other aggravating factors (not established by such means) in exercising his or her discretion to select among the three sentences for which the defendant is eligible?  Supplemental briefs must be served and filed in the San Francisco office of this court not later than February 28, 2007, and simultaneous reply briefs may be served and filed in the San Francisco office of this court no later than March 9, 2007.

(<u>See</u> http://www.courtinfo.ca.gov (last visited May 18, 2007).)

Thus, the California Supreme Court is considering on an expedited basis the effect of <u>Cunningham</u> on California's sentencing scheme.  One particular issue under consideration in <u>Towne</u> is also at issue here.  Namely, whether imposition of upper terms based on numerous serious prior adult convictions is sufficient to satisfy the Sixth Amendment even if the trial judge also relied on other factors.  In fact, prior to Petitioner's conviction becoming final, the court in <u>Towne</u> had already granted review on the question whether <u>Blakely</u> precludes a trial court from making findings used to aggravate a sentence and, if so, what standard of harmless error review applies.  <u>See</u> <u>id.</u>  Respondent also notes that the California Supreme Court has ordered expedited review on the effect of <u>Cunningham</u> in six other cases, and that there is currently a bill in the

1   California Legislature that would amend California's sentencing laws to comply with

2   Cunningham.  (Ans. Mem. at 14 n.5.)

3        Petitioner's claim was denied by the appellate court here on the basis of the now-invalid

4   holding of Black, which is currently on remand from the United States Supreme Court, and,

5   alternately, on the fact that reliance on prior convictions which were found true beyond a

6   reasonable doubt to impose the upper terms renders reliance on other improper factors irrelevant.

7   Because the state supreme court is currently deciding the effect of Cunningham on those exact

8   issues in a case which was pending at the time Petitioner's conviction became final, as well as

9   on remand in the very case upon which the appellate court here relied, state court remedies

10   remain available to Petitioner, and claim four is unexhausted.  See Picard v. Connor, 404 U.S.

11   270, 276 (1971) (noting that it is an open issue whether intervening change in federal law can

12   render a previously exhausted claim unexhausted), citing Blair v. California, 340 F.2d 741 (9th

13   Cir. 1965) (holding that an intervening change in federal law that casts a claim in a

14   fundamentally different light can render an exhausted claim unexhausted.)[5]

15        Petitioner recognizes that under Picard a claim can become unexhausted when it is cast

16   in a fundamentally different light.  (Traverse at 9.)  He argues, however, that Cunningham did

17   not cast his claim in such a new light because Cunningham did not announce an intervening

18   change in federal law, as it merely applied the rule of Apprendi, an application which should

19   have been apparent to the state courts at least after Blakely.  (Traverse at 9.)  As discussed below

20   in the Teague section of this Report, claim four has been cast in a fundamentally different light

21   due to Cunningham.  The Court therefore finds that state court remedies remain available with

22   respect to claim four.  As set forth at the end of this Report, the Court recommends this action

23   be stayed pending exhaustion of claim four.

24   _____

25       [5]  The Ninth Circuit has required a return to state court to exhaust claims in a number of analogous situations.  See Sweet v. Cupp, 640 F.2d 233, 237 (9th Cir. 1981) (rule establishing more

26   stringent standard for weighing equal protection challenge to gender-based statute); Daboul v. Craven, 429 F.2d 164, 167-68 (9th Cir. 1970) (due process in line-up procedures); Palmer v. Comstock, 394 F.2d

27   395, 395-96 (9th Cir. 1968) (right to counsel on probation revocation); Ashley v. California, 397 F.2d 270, 270 (9th Cir. 1968) (rule requiring hearing to determine competency to stand trial); Blair v.

28   California, 340 F.3d 741, 744-45 (9th Cir. 1965) (rule of constitutional right to appointment of counsel on appeal).

**2.  The Court cannot deny the Petition while state remedies remain available.**

Respondent next contends that the Petition can be denied notwithstanding the fact that claim four is unexhausted.  (Ans. Mem. at 15-25.)  Section 2254(b)(2) provides that: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C.A. § 2254(b)(2)(West 2006).  However, the Ninth Circuit has held "that a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim."  Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005), cert. denied, 126 S.Ct. 1336 (2006).  This standard is satisfied only if it is perfectly clear that Petitioner "has no chance of obtaining relief."  Id. at 624.  The Court in Cassett held that such a high standard was necessary to give due consideration to the principles of comity and the legislative goals of AEDPA, and to thereby avoid "depriv[ing] state courts of the opportunity to address a colorable federal claim in the first instance and grant relief if they believe it is warranted."  Id.  Respondent contends that Petitioner has no chance of obtaining relief on claim four for three reasons: (1) because Teague prevents him from taking advantage of the new rule announced in Cunningham; (2) because the state court's adjudication of the claim was neither contrary to nor involved an unreasonable application of clearly established federal law irrespective of Cunningham; and (3) because any error was harmless.  (Ans. Mem. at 15-25.)

For the following reasons, the Court finds that, based on an analysis of the Teague issue and application of the harmless error standard, and giving due consideration to the principles of comity and the legislative goals of AEDPA which the Ninth Circuit held in Cassett were necessary to avoid "depriv[ing] state courts of the opportunity to address a colorable federal claim in the first instance and grant relief if they believe it is warranted," id. at 624, the Court is precluded at this time from finding that "it is perfectly clear that Petitioner has no chance of obtaining relief" as to claim four.  Thus, without adjudicating the merits of claim four at this time, the Court finds that it may not deny the Petition while state court remedies remain available to Petitioner.

/ / /

### i) **Teague**

In Teague v. Lane, a plurality of the Court clarified the retroactivity analysis applicable to state criminal cases on collateral review in federal court, and held that although a "new rule" of substantive criminal law ordinarily will be applied retroactively to cases which have already become final, a "new rule" of criminal procedure may be applied retroactively on collateral review only if it satisfies one of two narrow exceptions. Teague, 489 U.S. at 299-316. Thus, the Court must determine whether the violation of Apprendi's "bright line rule" described above is a "new rule" for purposes of retroactivity analysis, if so, whether it is substantive or procedural, and, if procedural, whether either of the Teague exceptions apply. The Court in Teague provided some guidance in determining what constitutes a "new rule," stating:

> It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. . . . To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

Teague, 489 U.S. at 301 (citations omitted).

Petitioner's conviction became final on or about February 28, 2006, the last day he could have filed a petition for writ of certiorari in the United States Supreme Court following the denial of his direct appeal to the California Supreme Court. See Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999). Both Blakely v. Washington, 542 U.S. 296 (2004), where the Court found that the state of Washington's sentencing scheme violated Apprendi, and United States v. Booker, 543 U.S. 220 (2005), where the Court found the federal sentencing guidelines violated Apprendi to the extent they were mandatory, were decided before Petitioner's conviction became final, as was, of course, Apprendi. Although the United States Supreme Court decided in Cunningham that, based on Blakely and Booker, California's sentencing scheme violated the "bright line rule" announced in Apprendi, Respondent contends that application of Apprendi to California's sentencing scheme was not dictated by prior precedent at the time Petitioner's conviction became final.

/ / /

In order to determine whether the right recognized here is a "new rule" within the meaning of Teague, the Court must determine whether the rule was dictated by Apprendi, Blakely and/or Booker. Respondent points to Ninth Circuit cases finding Apprendi, Blakely and Booker to have each announced a new rule under Teague, and argues that Cunningham announced a new rule for the same reasons. (Ans. Mem. at 18-19, citing Cooper-Smith v. Palmateer, 397 F.3d 1236, 1246 (9th Cir.), cert. denied, 126 S.Ct. 442 (2005) (Apprendi), Schardt v. Payne, 414 F.3d 1025, 1027 (9th Cir. 2005) (Blakely), and United States v. Cruz, 423 F.3d 1119, 1120-21 (9th Cir. 2005), cert. denied, 126 S.Ct. 1181 (2006) (Booker).)

Respondent is correct that the Ninth Circuit has held that Apprendi, Blakely and Booker announced new rules. However, the issue here is whether Cunningham announced a new rule. This turns on whether Cunningham was dictated by precedent after Booker was decided. Each time Apprendi has been applied to a sentencing scheme, to Washington state law in Blakely and to the federal guidelines in Booker, the argument that the result was not dictated by Apprendi has become weaker. Respondent points to the dissenting Justice's opinions in Blakely, Booker and Cunningham, as well as the majority opinion in Black, as evidence that reasonable jurists could disagree that the result was dictated by prior precedent. See e.g. Beard v. Banks, 542 U.S. 406, 413 (2004) ("We must therefore assay the legal landscape as of [the time the conviction became final] and ask 'whether the rule . . . was *dictated* by then-existing precedent–whether, that is, the unlawfulness of [the] conviction was apparent to all reasonable jurists.'"), quoting Lambrix v. Singletary, 520 U.S. 518, 527-28 (1997). The Court's language in Cunningham that California's sentencing scheme violates the "bright line" rule of Apprendi, as well as the language in Cunningham that applied Booker, does not necessarily support a finding that Cunningham was dictated by Blakely, Booker or Apprendi. See Butler v. McKellar, 494 U.S. 407, 415 (1990) ("[T]he fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*.") Although Respondent presents a strong argument that the result in Cunningham was not dictated by precedent existing at the time that Petitioner's conviction became final, the issue need not be

resolved at this time, because this and the remaining aspects of the <u>Teague</u> analysis are not so obviously fatal to Petitioner's claim so as to render it "perfectly clear" that Petitioner "has no chance of obtaining relief" on claim four.

Assuming <u>Cunningham</u> announced a "new rule" within the meaning of <u>Teague</u>, it would most likely be a procedural rule.  In <u>Schriro v. Summerlin</u>, 542 U.S. 348 (2004), the Court held that a rule "requiring that a jury rather than a judge find the essential facts bearing on punishment" in capital cases was a "prototypical" procedural rule under <u>Teague</u>.  <u>Schriro</u>, 542 U.S. at 354.  However, the Court here is dealing with a rule that requires a fact be found beyond a reasonable doubt rather than under a preponderance of the evidence standard, something quite different from the rule at issue in <u>Schriro</u> requiring a jury rather than a judge to make factual findings under a preponderance of the evidence standard.  There is a powerful argument that the rule at issue here would be considered substantive rather than procedural, and therefore retroactively applicable, because it requires findings be made beyond a reasonable doubt rather than by a preponderance of the evidence.  <u>See e.g.</u> <u>Booker</u>, 543 U.S. at 319 n.6 (Opinion of Thomas, J., dissenting) (noting that <u>Booker</u> corrected the mistaken belief that the Fifth Amendment permitted a finding by a preponderance of the evidence of any fact which increases a sentence); <u>Harris v. United States</u>, 536 U.S. 545, 566 (2002) ("The Fifth and Sixth Amendments ensure that the defendant 'will never get more punishment than he bargained for when he did the crime.'"), quoting <u>Apprendi</u>, 530 U.S. at 498 (opinion of Scalia, J., concurring); Nicholas J. Eichenseer, Comment, <u>Reasonable Doubt in the Rear-View Mirror: The Case for Blakely-Booker Retroactivity in the Federal System</u>, 2005 Wis. L. Rev. 1137 (2005) (arguing that under a Fifth Amendment analysis the rule announced in <u>Blakely</u> might be considered substantive under <u>Teague</u>).

Again, the Court need not decide whether the rule of <u>Cunningham</u> is substantive or procedural at this time for the following reason.  Assuming <u>Cunningham</u> announced a new rule of criminal procedure, its application is prohibited unless it falls within one of two exceptions: (1) "it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe"; or (2) "is an absolute prerequisite to fundamental

fairness that is implicit in the concept of ordered liberty." Teague, 489 U.S. at 311-14. The first exception does not apply because California unquestionably has the right to criminalize and punish the behavior exhibited by Petitioner. The second exception may apply, however, because of the unique nature of the standard of proof beyond a reasonable doubt. Although the Ninth Circuit held that Booker announced a new procedural rule, that holding was limited to Sixth Amendment analysis. Cruz, 423 F.3d at 1120. The issue before this Court, on the other hand, as was the issue before Cunningham, is whether sentencing factors must be found beyond a reasonable doubt rather than under a preponderance of the evidence standard. The rationale of Schriro's holding that the second Teague exception does not apply, namely, that because both judge and jury are equally capable of making such findings the rule does not give rise to an impermissibly large risk of injustice, does not necessarily apply here. In fact, the Supreme Court has stated, albeit prior to Teague, that a rule requiring a fact to be found beyond a reasonable doubt should be given full retroactive effect. Ivan V. v. City of New York, 407 U.S. 203, 205 (1972) (holding that "the major purpose of the constitutional standard of proof beyond a reasonable doubt announced in [In re Winship, 397 U.S. 358 (1970)] was to overcome an aspect of a criminal trial that substantially impairs the truth-finding function, and Winship is thus to be given complete retroactive effect."); Hankerson v. North Carolina, 432 U.S. 233, 243-44 (1977) (applying retroactive effect of Winship to procedural rules which shift the burden of proof).

The Court does not need to determine at this time whether Cunningham announces a new rule within the meaning of Teague, whether such a rule is substantive or procedural, and, if procedural, whether it falls within the second Teague exception. Based on the discussion above it is not "perfectly clear" that Petitioner "has no chance of obtaining relief" due to a Teague bar. Cassett, 406 F.3d at 623-24. Rather, the resolution of the Teague issue is complex enough that it implicates the principles of comity and the legislative goals of AEDPA which the Ninth Circuit held in Cassett were necessary to avoid "depriv[ing] state courts of the opportunity to address a colorable federal claim in the first instance and grant relief if they believe it is warranted." Id. at 624. Because Petitioner has available state remedies remaining with respect to claim four, the Court is unable to deny the Petition at this time on the basis Teague.

**ii) 2254(d)**

Respondent also contends that claim four does not present a colorable claim because the state court's adjudication of the claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d). Respondent contends that <u>Cunningham</u>, even if retroactive, would not preclude the trial judge from imposing the upper terms based on two of the five factors articulated by the trial judge. (Ans. Mem at 21-24.)  Respondent argues that two of the factors used here to impose the upper terms (Petitioner's prior convictions as an adult were numerous and of increasing seriousness and he had served a prior prison term), are exempt from <u>Apprendi</u>'s rule, and once the trial judge found those factors to be true beyond a reasonable doubt, which he did, then he was free to rely on as many other factors as he wished, irrespective of whether they were found to be true under a preponderance of the evidence standard or beyond a reasonable doubt.  (<u>Id.</u>)

The Ninth Circuit, in the context of <u>Booker</u> error, has found that, with the exception of those "rare" cases such as where imposition of a mandatory minimum sentence precludes imposition of a lesser sentence on remand, or where the sentencing judge states on the record the sentence would not change if certain factors were not required to be taken into consideration, for a <u>Blakely/Booker</u> error to be harmless, the Court must determine whether the sentencing judge would have imposed the same sentence if the judge had not relied on the impermissible factors.  <u>United States v. Beng-Salazar</u>, 452 U.S. 1088, 1096 (9th Cir. 2006); <u>United States v. Seschillie</u>, 310 F.3d 1208, 1214 (9th Cir. 2002).  The clearly established federal law at the time Petitioner's conviction became final required federal courts to apply harmless error doctrine in determining whether a sentencing error such as is alleged here was harmless.  <u>See</u> <u>Booker</u>, 543 U.S. at 268 (holding that "we expect reviewing courts to apply ordinary prudential doctrines . . . [including] the harmless error doctrine.")  For the reasons discussed below with respect to the harmless error analysis, the record does not support a finding that Petitioner's sentence would have been the same if the trial judge had not taken the impermissible factors into consideration.  Therefore, it is not "perfectly clear" that Petitioner "has no chance of obtaining relief" under section 2254(d).  <u>Cassett</u>, 406 F.3d at 623-24.

### iii)  harmless error

Finally, Respondent contends that Petitioner does not raise a colorable claim due to the harmlessness of the error.  Respondent contends any error was harmless because the trial judge's reasoning for imposing the upper terms "was drawn from largely uncontested or overwhelming evidence."  (Ans. Mem. at 24-25.)  Respondent argues that Petitioner's conduct in the instant offenses indisputably presented a danger to society, which a jury would have found if they had been asked, and in light of the lack of any mitigating factors, the trial judge would have imposed the same sentence.  (Id. at 25.)

Petitioner argues that although he engaged in conduct that was a threat to society, a jury might have found as a mitigating factor the fact that no one was harmed in any of the eight armed robberies he committed.  (Traverse at 14.)  He also contends a jury might have concluded that his prior convictions should not be used to impose the upper terms since they were already used to impose a sentence under the Three Strikes law, that his satisfactory parole performance might have been found to mitigate his unsatisfactory probation performance, and that a jury might have concluded the facts in aggravation did not outweigh the facts in mitigation.  (Id.)

In order to determine whether Petitioner is entitled to federal habeas relief, this Court is required to determine whether the "record review leaves the conscientious judge in grave doubt about the likely effect of [the] error."  Padilla, 309 F.3d at 621-22.  The error here being imposition of the upper terms based on facts, other than the fact of Petitioner's prior convictions, which were found by the trial judge under a preponderance of the evidence standard.  Although Petitioner had three prior convictions, all of which were proven true beyond a reasonable doubt, the facts surrounding his twelve current convictions, all armed robberies, may well have provided the sentencing judge with the impetus to impose the upper terms.  Only two of the five factors relied on by the trial judge involved Petitioner's prior convictions, including the prior convictions themselves and the fact that Petitioner served prior prison terms as a result of those convictions.  The other factors included the findings that: (1) "The crime in each of these matters involved great threat of great bodily harm or other acts, disclosing a high degree of viciousness or callousness"; (2) that "each of these counts could be enhanced individually . . . and . . .

defendant was convicted of other crimes from which consecutive sentences could have been imposed but for which concurrent sentences are being imposed": and (3) that Petitioner "has engaged in violent conduct which indicates a serious danger to society."  (Lodgment No. 2, Reporter's Tr. at 603.)  Considering the powerful nature of the terms used in these factors, such as "high degree of viciousness or callousness" and "great threat of bodily harm," the "record review leaves the conscientious judge in grave doubt" about whether the trial judge would have selected the upper terms for all twelve convictions if he had not taken these factors into consideration.  Padilla, 309 F.3d at 621-22.

At first blush any error might appear harmless because imposition of the upper terms rather than the presumptively correct middle terms increased the sentence by only 16 years, resulting in a sentence of 335 years-to-life rather than 319 years-to-life, a difference irrelevant in the ordinary span of a human lifetime.  However, the harmlessness inquiry looks to whether the judge would have imposed the upper term but for the error, not whether Petitioner can serve the sentence he received.  Even were that not the case, the aspect of claim four regarding the decision to run the sentences consecutively on the basis of facts not submitted to the jury has the potential to affect Petitioner's release date.  Here, there is a grave doubt whether the judge would have imposed the upper term sentence if he had not considered the impermissible factors.  Thus, the Court cannot say that "it is perfectly clear that Petitioner has no chance of obtaining relief" on his claim due to the harmless error doctrine.

In sum, because it is not "perfectly clear" that Petitioner "has no chance of obtaining relief" due to a Teague bar, under section 2254(d) or under the harmless error doctrine, the Court is unable to deny the Petition as long as state court remedies remain available to Petitioner.  Cassett, 406 F.3d at 623-24.  Rather, resolution of these issues implicates the principles of comity and the legislative goals of AEDPA which the Ninth Circuit held in Cassett were necessary to avoid "depriv[ing] state courts of the opportunity to address a colorable federal claim in the first instance and grant relief if they believe it is warranted."  Id. at 624. Accordingly, the Court finds that the Petition cannot be denied while state court remedies remain available to Petitioner with respect to claim four.

**3.  The Court is unable to grant the Petition while state remedies remain available.**

This Court is also unable to grant habeas relief if state remedies remain available to Petitioner.  28 U.S.C. § 2254(b)(1), provides that:

> (b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgement of a State court shall not be granted unless it appears that-
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C.A. 2254(b)(1) (West 2006).

Because state court remedies remain available with respect to claim four, even to the extent Petitioner is entitled to habeas relief, the Court is unable to grant relief at this time.

**4.  Conclusion.**

The Court finds that state court remedies remain available to Petitioner as to claim four and the Court is unable to grant or deny the Petition at this time.  The Court therefore recommends this action be stayed while Petitioner returns to state court to exhaust his state court remedies with respect to claim four, or until such time as the California Supreme Court rules in such a manner as to make it clear that Petitioner is not entitled to relief in the state courts as to claim four presented in the Petition.  See Jackson v. Roe, 425 F.3d 654, 660 (9th Cir. 2005) (interpreting Rhines v. Weber, 544 U.S. 269 (2005) as permitting a district court to stay a mixed petition pending exhaustion of state court remedies).

## VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) issuing an Order staying this action pending exhaustion of state court remedies with respect to claim four.

/ / /

**IT IS ORDERED** that no later than **July 2, 2007** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 16, 2007**.  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  May 30, 2007

Hon. William McCurine, Jr.
U.S. Magistrate Judge
United States District Court


CC:  HON. M. JAMES LORENZ, UNITED STATES DISTRICT JUDGE
        ALL PARTIES AND COUNSEL OF RECORD

07cv0017